**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| DEBBIE PLUCKER,<br><br>                    Plaintiff,<br><br>vs.<br><br>UNITED FIRE & CASUALTY COMPANY,<br><br>                    Defendant. | Civ. 12-4075<br><br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |

The Plaintiff, Debbie Plucker, by and through her counsel, Cutler & Donahoe, LLP, submits the following Brief in Support of her Motion to Compel Production of Documents.

**PRELIMINARY STATEMENT**

This is a breach of contract and bad-faith action against Defendant United Fire & Casualty Company (hereinafter "United Fire").  Plaintiff seeks an order pursuant to Rule 37(a) to compel Defendant to comply with discovery requests that have been outstanding for nearly a year.  Plaintiff has made efforts to meet and confer.

## PROCEDURAL HISTORY

On October 29, 2012, Plaintiff served her first set of Interrogatories and Requests for Production on Defendant.[1]  Plaintiff included a proposed protective order to accommodate any privacy concerns Defendant might have.[2]   On November 30, 2012, Defendant's counsel contacted Plaintiff's counsel, requesting an extension for production because of the holiday season.[3] Plaintiff's counsel responded on December 3, 2012, agreeing to extend the production deadlines to January 14, 2013.[4]  With the deadline soon approaching, Plaintiff's counsel inquired whether there would be any additional delay by Defendant with production.[5]   A paralegal working for Defendant's counsel responded that discovery was ready, but that Defendant's counsel was attempting to identify the proper employee for Defendant to sign the Interrogatory Answers.[6]

Then, on January 15, 2013, Defendant's counsel's paralegal informed Plaintiff's counsel that Defendant assigned the case to a different individual, who would have to review the responses again before production could be formalized.[7]   Plaintiff's counsel requested an unsigned copy, if the issue was simply one of getting a signature.[8]

Defendant's counsel called Plaintiff's counsel on Friday, January 18, 2013.[9]  Defendant's counsel promised that Defendant would respond by early the next week.[10]  By Thursday, January

---

[1]  *See* Affidavit of Counsel, Exhibit A (Plaintiff's Interrogatories and Requests for Production of Documents).

[2]  *See* Affidavit of Counsel, Exhibit B (Plaintiff's Proposed Protective Order).

[3]  *See* Affidavit of Counsel, Exhibit C (November 30, 2012 email from DeNure to Trzynka).

[4]  *See* Affidavit of Counsel, Exhibit D (December 3, 2012 email from Trzynka to DeNure).

[5]  *See* Affidavit of Counsel, Exhibit E (January 11, 2013 email from Trzynka to DeNure).

[6]  *See* Affidavit of Counsel, Exhibit F (January 14, 2013 email from Riter to Trzynka).

[7]  *See* Affidavit of Counsel, Exhibit G (January 15, 2013 email from Riter to Trzynka).

[8]  *See* Affidavit of Counsel, Exhibit H (January 15, 2013 email from Trzynka to Riter).

[9]  *See* Affidavit of Counsel, Exhibit I (January 24, 2013 email from Trzynka to Kouri).

[10]  *Id.*

24, 2013, however, Defendant had not yet responded.[11]   On January 25, 2013, Defendant's counsel provided an unsigned copy of Defendant's Answer to Interrogatories and Responses to Requests for Production of Documents.[12]   Defendant had not signed Plaintiff's proposed protective order and included a separate order for Plaintiff to sign.[13]   To date, Plaintiff has not yet received signed Answers to Interrogatories from Defendant.  Even so, Defendant's responses to Plaintiff's Interrogatories and Requests for Production were incomplete.[14]   In fact, Defendant produced no new documents it hadn't already produced in its initial disclosures.  Frequently, Defendant relied on only unsubstantiated boilerplate objections.[15]   Defendant similarly failed to include a privilege log substantiating its numerous assertions of privilege.[16]

On January 28, 2013, Plaintiff's counsel wrote Defendant's counsel a letter, outlining Plaintiff's concern with Defendant's proposed protective order.[17]   Over the next couple of weeks, Plaintiff's and Defendant's counsels conversed over the phone in an attempt to meet and confer over both the protective order and discovery response issues.[18]   On February 20, 2013, Plaintiff's counsel wrote Defendant's counsel a letter outlining Plaintiff's concerns with Defendant's production.[19]

Between February 20 and April 23, 2013, Plaintiff's counsel frequently attempted to confer with Defendant's counsel regarding discovery and Defendant's proposed protective order,

---

[11]   *Id.*
[12]   *See* Affidavit of Counsel, Exhibit J  (January 25, 2013 letter from Kouri to Trzynka).
[13]   *See* Affidavit of Counsel, Exhibit K (Defendant's January 25, 2013 proposed protective order).
[14]   *See* Affidavit of Counsel, Exhibit L (Defendant's Responses to Plaintiff's Interrogatories and Requests for Production of Documents (First Set)).
[15]   *See*, *generally*, *id.*
[16]   *Id.*
[17]   *See* Affidavit of Counsel, Exhibit M (January 28, 2013 letter from Trzynka to Kouri).
[18]   *See* Affidavit of Counsel, Exhibit N (February 20, 2013 letter from Trzynka to Kouri).
[19]   *Id.*

3

often with no response.  On April 18, Plaintiff's counsel agreed to sign Defendant's proposed protective order and indicated that, based on the conversations between Plaintiff's counsel and Defendant's counsel, Plaintiff anticipated that supplementation would be imminent.[20]

On May 10, 2013, Defendant supplemented its discovery responses.[21]  Defendant produced over 1800 pages of documents, but it didn't provide Plaintiff with an index or any guide describing which documents corresponded to what requests.[22]  Additionally, while Defendant's supplement contained responses to some of Plaintiff's requests, there were still a number of incomplete areas.  For example, Defendant refused to turn over many of the employment files Plaintiff requested or, in the alternative, insisted that the Court conduct an *in camera* review of them.  Defendant devoted the majority of its supplementation to financial reports and newsletters.[23]  In fact, Defendant produced over 600 pages of annual financial reports and just under 400 pages of internal newsletters.[24]  Meanwhile, Defendant refused to turn over any information pertaining to any specific claims examiner or anyone up their chain of command, including what bonuses they received or were eligible for.[25]

Plaintiff then attempted to schedule depositions and to set a date for the Court to conduct its *in camera* review.[26]  Defendant did not respond.  On June 26, 2013, Plaintiff's counsel again attempted to confer with Defendant's counsel regarding the ongoing discovery issues.[27]  At that point, Plaintiff's counsel agreed to an in camera review of the two employment files Defendant

---

[20] *See* Affidavit of Counsel, Exhibit O (April 23, 2013 email from Trzynka to Kouri).

[21] *See* Affidavit of Counsel, Exhibit P (May 10, 2013 letter from Riter to Trzynka).

[22] *See* Affidavit of Counsel, ¶ QQ.

[23] *See* Affidavit of Counsel, ¶ RR.

[24] *Id*.

[25] *See* Affidavit of Counsel, Exhibit, Exhibit L (Defendant's Responses to Plaintiff's Interrogatories and Requests for Production of Documents (First Set)).

[26] *See* Affidavit of Counsel, Exhibit Q (May 14, 2013 email from Trzynka to Kouri).

[27] *See* Affidavit of Counsel, Exhibit R (June 26, 2013 letter from Trzynka to Kouri).

agreed to produce if doing so would expedite production.  Plaintiff's counsel noted that if Defendant's counsel did not respond by July 1, 2013, Plaintiff would be forced to file a motion to compel with the Court.[28]

At this point, Defendant's counsel largely stopped communicating in writing with Plaintiff's counsel and relied on phone conversations instead.  Between June and August, Plaintiff's counsel exchanged several phone calls with Defendant's counsel in an attempt to confer and avoid litigation regarding discovery.  Defendant's counsel indicated that a different attorney within his firm would be taking over.

By August 16, 2013, however, Plaintiff's counsel had not heard anything additional from either of Defendant's counsel regarding production.[29]  Plaintiff's counsel indicated that if Defendant's counsel did not respond by that Wednesday, Plaintiff would be forced to file a Motion to Compel.[30]  As before, Defendant's counsel called Plaintiff's counsel just before the deadline promising that supplementation was imminent, but that Defendant's counsel needed just a little more time to work things out.

In mid-August 2013, Plaintiff's counsel and Defendant's counsel engaged in a lengthy discussion of discovery issues and the case law as it exists for bad-faith discovery.[31] Defendant's counsel indicated that he would review the law and would get back to Plaintiff's counsel soon regarding these issues.  Plaintiff's counsel indicated that the in camera review for employment records was off the table since it hadn't expedited production.  Defendant's counsel reassured Plaintiff's counsel that discovery would be provided for many of these outstanding requests shortly.

---

[28] *Id.*
[29] *See* Affidavit of Counsel, Exhibit S (August 16, 2013 email from Trzynka to Kouri).
[30] *Id.*
[31] *See* Affidavit of Counsel, Exhibit T (August 19, 2013 email from Trzynka to DeNure).

By mid-September 2013, however, Defendant hadn't supplemented.  Plaintiff wrote Defendant's counsel noting that the Motions Deadline was approaching and that discovery had not been completed.[32]  Plaintiff's counsel advised Defendant's counsel that with the motions deadline approaching, Plaintiff would need to file motions in order to preserve her ongoing discovery concerns.  Defendant's counsel again promised that discovery was imminent, but that they needed just a little more time.

October 1, 2013 was the motions deadline for this case.  By this date, however, Defendant still had not produced the documents it promised to produce or to sign a stipulation to modify the scheduling order Plaintiff sent the prior week.[33]  Plaintiff's counsel left messages with Defendant's counsel advising that if Defendant did not submit to a stipulation extending deadlines, Plaintiff would be forced to file a motion to compel and a unilateral motion to extend deadlines.  Defendant's counsel signed the stipulation and again indicated that supplementation was just round the corner.  By October 15, however, Defendant still had not supplemented discovery, so Plaintiff's counsel left a message for Defendant's counsel to request production.  Defendant's counsel again requested a week or two to provide the documents.  Defendant's counsel indicated it was in ongoing talks with Defendant and that this was causing the delay.  Plaintiff's counsel gave Defendant's counsel until the next day to produce.  Defendant failed to do so.  Plaintiff then filed the instant motion.

### STATEMENT OF THE FACTS

The Plaintiff, Debbie Plucker, is a small business owner from Sioux Falls, South Dakota. On May 24, 2011, Ms. Plucker was driving her 2011 Chevrolet Silverado pickup north on

---

[32]  *See* Affidavit of Counsel, Exhibit U (September 17, 2013 email from Trzynka to DeNure).
[33]  *See* Affidavit of Counsel, Exhibit V (September 23 2013 email from Trzynka to DeNure); Exhibit W (October 1, 2013 email from Trzynka to DeNure).

Interstate 29 near Sioux Falls.[34]   Meanwhile, a semi-tractor/trailer was driving in southbound traffic.[35]   As the southbound semi-tractor/trailer approached, one of its large tires and its rim came off the trailer's axle and careened toward northbound traffic.[36]   The tire and rim skipped across the median and into northbound traffic, bouncing off another semi-tractor/trailer in front of Ms. Plucker to head straight toward Ms. Plucker's pickup.[37]

Ms. Plucker attempted to evade the errant tire/rim, but she was unsuccessful.[38]   The tire/rim slammed into the front of Ms. Plucker's vehicle.[39]   Between the collision itself and her hard baking in an attempt to avoid any crash, Ms. Plucker's head and upper body lunged forward, injuring her.[40]

Ms. Plucker contacted her insurer, United Fire, to report the accident and to request coverage.[41]   United Fire assigned Sherri Wade as Ms. Plucker's claims examiner.[42]   The next day, United Fire called Ms. Plucker to interview her about the accident.[43]   Among other things, Ms. Plucker told United Fire that she was in a lot of pain and that she was seeing a doctor for it.[44]

Earlier that day, Ms. Plucker saw Dr. Rob Lanpher, a local chiropractor, to treat her injuries.[45]   Ms. Plucker signed a release so that Dr. Lampher's office could be compensated

---

[34]   *See* Affidavit of Counsel, Exhibit X (Accident Report).
[35]   *Id.*
[36]   *Id.* (It was later discovered that the rear axle of Vehicle #2 had been replaced just a half hour earlier.  The mechanic "admitted that he must have forgot [sic] to tighten the lug nuts.").
[37]   *Id.*
[38]   *Id.*
[39]   *Id.*
[40]   *See* Affidavit of Counsel, Exhibit Y at LCC_MVA_00001 (Lanpher Medical Records).
[41]   *See* Affidavit of Counsel, Exhibit Z at UF000001 (Defendant's Claim File).
[42]   *Id.* at UF000002.
[43]   *See* Affidavit of Counsel, Exhibit AA at UF000073-79 (Defendant's Interview of Plucker).
[44]   *Id.* at UF000078.
[45]   *See* Affidavit of Counsel, Exhibit Y at LCC_MVA_00001 (Lanpher Medical Records).

directly by her insurance company.[46]

Ms. Plucker continued to treat with Dr. Lanpher for her injuries.[47]  Dr. Lanpher's office submitted its bills to United Fire, relying on the model Health Insurance Claim Form.[48]  The form contains a medical release so that United Fire could obtain "any medical or other information *necessary* to process this claim."[49]  This language echoes Ms. Plucker's policy language, which authorizes United Fire to obtain "medical reports" and "other pertinent records."[50]

Even so, United Fire sent Ms. Plucker a separate medical release.[51]  This release allowed United Fire to obtain more than just the "medical or other information necessary to process"[52] Ms. Plucker's claim.  Instead, United Fire's release permitted it to obtain "[a]ny and all medical records, including reports involving alcohol, drug abuse, or psychiatric treatment or recovery (if applicable) from 5/24/11 to Present."[53]  It also contained other provisions allowing it to obtain HIV/AIDS. United Fire's release further permitted it to disclose any or all of Ms. Plucker's medical records to third parties without notifying Ms. Plucker or getting her approval to do so.[54]

Like many South Dakotans, Ms. Plucker is a private person.  She believed that United

---

[46] *Id*. at LCC_MVA_00002.

[47] *See*, *generally*, Affidavit of Counsel, Exhibit BB at LCC_MVA_BILL_00001-26 (Lanpher Billing Statements).

[48] *Id*.

[49] *See*, *eg*., *id*. at LCC_MVA_BILL_00001 (Lanpher Billing Statements) (emphasis added) ("PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim.  I also request payment of government benefits either to myself or to the party who accepts assignment below.").

[50] *See* Affidavit of Counsel, Exhibit CC at UF000111-12 (July 13, 2011 Letter from Defendant to Plucker).

[51] *See* Affidavit of Counsel, Exhibit DD at UF000108-110 (May 26, 2011 Letter from Defendant to Plucker).

[52] *See, eg.*, Affidavit of Counsel, Exhibit BB at LCC_MVA_BILL_00001 (Lanpher Billing Statements).

[53] *See* Affidavit of Counsel, Exhibit DD at UF000110 (May 26, 2011 Letter from Defendant to Plucker).

[54] *Id*.

Fire's medical release was intrusive and unnecessarily expansive when compared to the injuries she sustained.  Additionally, Ms. Plucker was concerned that the release allowed United Fire to share her medical history with others without either her knowledge or approval.  As a result, Ms. Plucker modified United Fire's Medical Release, signed it, and returned it to United Fire.[55]  Ms. Plucker crossed out the following italicized sections:

> *I acknowledge that information to be released may include material that is protected by state and/or federal law applicable to mental health, alcohol/drug abuse, HIV/AIDS or all of these.  My signature authorizes release of all such information as specified above.*

> *I acknowledge that information used or disclosed pursuant to this authorization may be subject to re-disclosure by United Fire and Casualty Company without further authorization.*

> Where information has been disclosed from records protected by federal law for alcohol/drug abuse records, by state law for mental health records or HIV/AIDS related records, federal requirements (42 CFR Part 2) and state requirements prohibit further disclosure without the specific written consent of the patient, or as otherwise permitted by such law and/or regulations.  Civil and/or criminal penalties may attach for unauthorized disclosure of alcohol/drug abuse, mental health or HIV/AIDS information.[56]

United Fire rejected Ms. Plucker's modifications and predicated payment of her bills on the unconditional release of Ms. Plucker's *complete* medical file.[57]

Over the following weeks, United Fire repeated its claim that it simply couldn't use the medical release form as modified by Ms. Plucker.[58]  United Fire, however, never asked Dr. Lanpher whether his office would accept the modified medical release form.[59]  Had it done so,

---

[55] *See* Affidavit of Counsel, Exhibit EE at UF000114 (Modified Medical Release).
[56] *Id.* (emphasis in original) (compare with Affidavit of Counsel, Exhibit Exhibit DD at UF000110 (May 26, 2011 Letter from Defendant to Plucker)).
[57] *See* Affidavit of Counsel, Exhibit Z at UF000013 (Defendant's Claim File).  *See also* Affidavit of Counsel, Exhibit FF at UF000044 (Defendant's Claim Status Reports).
[58] *See, id.,* at UF000010-13.
[59] *See* Affidavit of Counsel, Exhibit GG (August 29, 2012 statement of Dr. Rob Lanpher).

United Fire would have discovered that Dr. Lanpher would have accepted the modified form.[60] In fact, United Fire made no effort to contact Dr. Lanpher's office at all.[61]   United Fire ignored that Dr. Lanpher's billing statements to United Fire contained a release for United Fire to obtain whatever medical records were necessary to authorize payment.[62]

United Fire then told Ms. Plucker that if she wanted payment, she would have to obtain her medical records, herself, and forward them to United Fire.[63]   Because Ms. Plucker's claim was small, United Fire decided not to "make a big deal out of" what United Fire characterized as "Debbie's refusal to help us help her."[64]   After all, United Fire had "a QR in the works and she [Ms. Plucker] said she was cancelling us anyway."[65]   From United Fire's perspective, it was a win-win because either Ms. Plucker would send "her bills into us w/ the records or we wait for subro from Medicare and pay accordingly."[66]

Eventually, United Fire told Ms. Plucker that they were just going to let Liberty Mutual, the insurer for the semi-tractor/trailer, pay Ms. Plucker's claim.  United Fire, however, told Ms. Plucker that there was no way that Liberty Mutual would pay Dr. Lanpher's bills because, as United Fire put it, Ms. Plucker's treatment was not necessary to treat her injuries.[67]   United Fire, however, conducted neither a record review nor any other investigation to make such a claim.

---

[60]   *Id*.

[61]   *Id*.

[62]   *See* Affidavit of Counsel, Exhibit BB at LCC_MVA_BILL_00001-26 (Lanpher Billing Statements) ("PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim.  I also request payment of government benefits either to myself or to the party who accepts assignment below.").

[63]   *See* Affidavit of Counsel, Exhibit Z at UF000011 (Defendant's Claim File).

[64]   *Id*. at UF000008.

[65]   *Id*.

[66]   *Id*.

[67]   *See* Affidavit of Counsel, Exhibit GG (August 29, 2012 statement of Dr. Rob Lanpher)

RULES IN THE INSURANCE INDUSTRY

United Fire chooses to put its own bottom line ahead of its policyholders' interests.   In fact, United Fire systematically deters claims by holding those claims for ransom unless its policyholder releases to United Fire unrelated and potentially embarrassing personal details; details *that United Fire expressly tells its insureds it will share with others*.   That is hardly the quasi-fiduciary relationship an insurer is supposed to have with its insured.

**An Insurer Cannot Put its Interests Above the Interests of its Policyholders**

"[T]he relationship of an insurer to its insured is like that of a fiduciary because the insurer must give as much consideration to its insured's interests as it does its own."[68]   An insurer commits bad faith where it seeks to "gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment."[69]   In other words, when an insurer puts its own interests, financial or otherwise, in front of its insured, it violates the insured's right to honest and fair treatment.   When an insurer does that, it commits the tort of bad faith.

---

[68] *Trouten v. Heritage Mut. Ins. Co.*, 2001 SD 106, ¶ 32, 632 N.W.2d 856, 864; *Bertelsen v. Allstate Ins. Co.*, 2011 SD 13, ¶ 47, 796 N.W.2d 685, 700.
[69] *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238, 995 P.2d 276, 280 (2000) (en banc).

**ARGUMENT**

Plaintiff's discovery requests are neither novel nor overly burdensome.  In fact, Plaintiff's discovery requests reflect regularly requested (and regularly compelled) discovery demands in this District.  Early on, Plaintiff advised Defendant regarding this Court's most recent rulings on discovery in insurance bad faith cases.  Defendant, however, maintains that it should not have to produce these materials.  Plaintiff's motion to compel centers on the following subject areas:

- Documents related to other bad-faith lawsuits;

- Testimony given in other bad-faith lawsuits;

- Personnel files for individuals involved with the claims decisions in this case;

- Claims and training manuals in use at the time that Defendant denied Plaintiff's claim;

- Quality assurance manuals and audit procedures;

- Regulatory complaints concerning handling of other first party automobile insurance claims;

- Programs designed to decrease loss ratios or decrease claims costs; and,

- Documents and information provided to regulatory agencies.

## I.     The Scope of Discovery is Intentionally Broad

As this Court recently noted, "[t]he scope of discovery under Rule 26(b) is extremely broad."[70]  Courts encourage broad discovery because "'[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession.'"[71]

---

[70] *Lillibridge v. Nautilus Ins. Co., No. 10-cv-4105, 2013 U.S. Dist. LEXIS 63398 at \*9 (D.S.D. May 3, 2013).*

[71] *Id.* (citing 8 Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 2007, 96

12

"'Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings.  Relevancy … encompass[es] any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'"[72]

## II.    Defendant's Objections are Insufficiently Substantiated and are Thus Waived

A resisting party bears the "burden to substantiate its objections."[73]  The resisting party "must demonstrate to the court 'that the requested documents either do not come within the broad scope of relevance defined pursuant to Fed. R. Civ. P. 26(b)(1) or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure."[74]

For instance, "[t]he objecting party *must* show *specifically* how each discovery request is burdensome or oppressive *by submitting affidavits or offering evidence* revealing the nature of the burden."[75]

In this District, attorneys are told to "carefully read *St. Paul Reinsurance Co. v. Commercial Financial Corp.*"[76]  In those rulings, Judge Bennett emphasized that, "boilerplate

---

(2d ed. 1994)(quoting *Hickman v. Taylor*, 329 U.S. 495 507-08, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947)))

[72] *Id.* (quoting *E.E.O.C. v. Woodmen of the World Life Ins. Society*, 2007 W. 1217919, 15 *1 (D.Neb. March 15, 2007) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)).

[73] *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan. 1997) (citing *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540 (10th Cir. 1984)).

[74] *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000) (D.N.D.Ia 2000) (citing *Burke v. N.Y. City Police Dep't*, 115 F.R.D. 220, 224 (S.D.N.Y. 1987)).

[75] *Id.* at 512 (D.N.D.Ia 2000) (emphasis added) (citing *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan. 1997)).

[76] *Kooima v. Zacklift Int'l*, 209 F.R.D. 444, 446 (D.S.D. 2002) (citing *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000) (D.N.D.Ia 2000)).

objections are improper."[77]  "General objections are not useful to the court ruling on a discovery motion.  Nor does a general objection fulfill a party's burden to explain its objections."[78]  Courts in this District repeatedly concur with Judge Bennett's sentiment.[79]

When asserting privilege, a party must "produce a privilege log identifying the particular documents to which a particular privilege was asserted."[80]  The objecting party must also "demonstrate that a *particularized harm* is likely to occur if the discovery be had by the party seeking it."[81]

If a privilege is not properly asserted, Courts hold that such privileges are waived.[82] Judge Bennett referenced *Disidore v. Mail Contractors of America* for the proposition that an improperly-asserted privilege waives the privilege.[83]

As the *Disidore* Court observed:

A "blanket claim" as to the applicability of the work product doctrine does not satisfy the burden of proof.  It is well settled that the party seeking to invoke work

---

[77] *St. Paul Reinsurance Co.*, 198 F.R.D. at 514 (D.N.D.Ia 2000).  *See also DL v. District of Columbia*, 251 F.R.D. 38, 43 (D.D.C. 2008); *Enron Corp. Sav. Plan v. Hewitt Assocs., 258 F.R.D. 149, 162 (S.D. Tex. 2009)* .

[78] *St. Paul Reinsurance Co.*, 198 F.R.D. at 513 (N.D. Ia 2000).

[79] *See Kooima*, 209 F.R.D. at 446 ("boilerplate objections are unacceptable."); *Diesel Machinery, Inc. v. Manitowoc Crane Group*, 2010 WL 4366059 at *4, 5 (D.S.D.) ("boilerplate objections are not well taken.");  *Lyon v. Bankers Life and Casualty Co.*, 2011 WL 124629 at *7 (D.S.D) ("defendant filed boiler plate objections and simply refused to proceed, thus depriving plaintiff of meaningful discovery.").

[80] *Lyon v. Bankers Life and Casualty Co.*, 2011 WL 124629 at *7.  *See also Paine Webber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 992 (8th Cir. 1999) ("most tribunals require the party asserting ... [a] privilege to provide the party seeking discovery with a list or log that describes the document without disclosing the allegedly privileged communications it contains.  This practice is now codified in ... Rule 26(b)(5)...."); *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974) (requiring parties who object to discovery on grounds of privilege to itemize and index the documents allegedly exempt from discovery so the court may determine whether any protection or privilege actually applies.").

[81] *St. Paul Reinsurance Co. v. Commercial Fin. Corp.* 198 F.R.D at 512 (D.N.D.Ia 2000) (citing *G-69 v. Degnan*, 130 F.R.D. 326, 331 (D.N.J. 1990)) (emphasis added).

[82]  *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 640 (N.D. Ia. 2000).

[83] *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 197 F.R.D.at 640 (N.D. Ia. 2000).

product immunity has the burden to establish *all* elements of the immunity and that this burden can be met only by an evidentiary showing based on competent evidence.  "That burden cannot be 'discharged by mere conclusory or ipse dixit assertions.'" A party's failure to meet this burden when the trial court is asked to rule upon the existence of the work product immunity is not excused because the document is later shown to be one that would have been privileged if a timely showing had been made.[84]

This sentiment is widely accepted and is contemplated by the Federal Rules.[85]

Here, Defendant failed to submit a privilege log in any of its responses.  Its objections are replete with rote privilege assertions.  Under the Rules, such tactics are inappropriate.

The requirement that parties substantiate their objections stems from each party's duty to litigate in good faith.  Parties that don't substantiate objections or that fail to submit privilege logs create mountains of work for an opponent (and the court) by merely copying and pasting a list of unsupported objections – which requires no work at all.  Without the objection substantiation rule, unsupported boilerplate objections become a devastating weapon, because a few minutes of copying and pasting multiple objections result in weeks of briefing for an opponent.

Failure to hold parties accountable who fail to substantiate objections or privilege assertions actually *encourages* dilatory tactics in the future.  Holding parties accountable streamlines litigation by focusing litigants' attention where it matters – on the *facts* of the case – instead of fighting over production of those facts.

---

[84] *Disidore v. Mail Contrs. Of Ma., Inc.*, 196 F.R.D. 410, 413 (D. Kan. 2000) (emphasis in original) (internal citations omitted).

[85] See, for example *Peat, Marwick Mitchell & Co. v. West*, 748 F.2d at 542 (10th Cir. 1984); *Pulsecard, Inc. v. Discover Card Servs.*, 168 F.R.D. 295, 303 (D. Kan. 1996) ("Use of general, reserved objections is disfavored.....Congress added Paragraph 4 [of Rule 33(b)] in 1993 'to make clear that objections must be specifically justified, and that unstated or untimely grounds for objections ordinarily are waived."); *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354 (D. Md. 2008); *Brenford Envtl. Sys., L.P. v. Pipeliners of P.R., Inc.*, 269 F.R.D. 143, 147 D.P.R. (2010); *Ritacca v. Abbot Labs*, 203 F.R.D 332, 334 (N.D. Ill. 2001).

Defendant didn't submit a privilege log.  Defendant failed to specify any evidence – *or even any argument* – supporting its rote objections.  Under the Rules, and the precedence of this District, Defendant's objections are waived.

## III.    Defendant Should Produce Bad Faith Litigation Documents

Plaintiff requested that Defendant provide documents and testimony related to other first-party automobile bad faith claims.  Plaintiff eventually agreed to initially limit these claims to med pay bad faith claims.  Plaintiff, however, still asked for all depositions and trial transcripts for any of Defendant's employees who worked on Plaintiff's claim or supervised these employees all the way to the head of the claims department.  Defendant, however, refuses to comply with these requests.  Plaintiff requested the following materials:

> **Request for Production 22:** Any and all transcripts of depositions or trial testimony of any of Defendant's employees or officers in any suit alleging breach of contract, fraud, or bad faith in a case arising out of first-party automobile claims from January 1, 2007 to present.

Courts favor allowing access to litigation materials from other suits.  Otherwise, "each litigant who wishes to ride a taxi to court must undertake the expense of inventing the wheel."[86]  As Judge Viken noted, "Judges of this district court have in numerous cases overruled objections to similar requests and required discovery of documents from other litigation."[87]

---

[86] *Ward v. Ford Motor Co.*, 93 F.R.D. 579, 580 (D. Colo. 1982).  See also *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539 (D. Id. 1991) (collaborative use of discovery fosters the just, speedy, and inexpensive determination of civil actions); *Patterson v. Ford Motor Co.*, 85 F.R.D. 152, 154 (W.D.Tx. 1980) (The sharing of discovery information between plaintiffs may reduce time and money which must be expended in similar proceedings, and allows for effective, speedy, and efficient representation.); *U.S. v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D. 421, 426 (W.D.N.Y. 1981) (Use of discovery disclosed in one lawsuit in connection with other litigation and even in collaboration among plaintiffs' attorneys, comes squarely within the purposes of Federal rules of Civil Procedure.); *Foltz v. State Farm Mut. Ins. Co.*, 331 F.3d 1122 (9th cir. 2003) ("This court strongly favors access to discovery materials to meet the needs of parties engaged in collateral litigation.").

[87] *Lyon v. Bankers Life and Casualty Co.*, 2011 WL 124629 at *13.  See also *McElgunn v.*

Judge Viken explained that such discovery is expensive and burdensome for plaintiffs.[88] Meanwhile, defendants could easily access it and provide it at little cost to plaintiffs.[89]  As a result, forcing plaintiffs to do this discovery themselves "places defendant[s] at an unusually significant advantage" over them.[90]

Information from these other cases may reveal numerous issues relevant to this case.  It may show other similar events of claims processing by this defendant, which goes toward the reprehensibility of its actions here.[91]  It may show prior adverse rulings, demonstrating that its actions in handling Ms. Plucker's claim were intentional and with actual malice[92] or, at least, with reckless disregard of her rights.[93]  It may reveal prior declarations by defendant's personnel regarding medical releases or how incentives are linked to improper claims handling.  It may also reveal material that may impeach Defendant's own witnesses here.

With regards to the maintenance of deposition and trial transcripts, Defendant has these documents and could easily produce them.  Like any other company Defendant has a legal

---

*CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 84 p. 3) (D.S.D. 2007); *McElgunn v. CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 204, p. 11) (D.S.D. 2008); *McElgunn v. CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 206, p. 9) (D.S.D. 2008); *Beyer v. Medico Insurance Group*, 266 F.R.D. 333, 338 (D.S.D. 2009) ("Medico is… ordered to produce all documents…. Production to include litigation documents, including but not limited to complaints, court orders, and the like."); *Brown Bear v. CUNAI,* 266 F.R.D 310, 326 ("Because the documents Brown Bear requests [prior litigation documents] may reveal that CUNA' alleged conduct in this case occurs frequently and as a result risks harm to many, the requested documents may be relevant to demonstrate reprehensibility, which is a proper consideration in a punitive damages determination.").

[88] *Id*. at *14.

[89] *Id*.

[90] *Id*.

[91] *See McElgunn v. CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 206, p. 6) (D.S.D. 2008) quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422, 123 S.Ct. 1513, 1522, 155 L.Ed. 2d 585 (2003).

[92] *See* SDCL § 21-3-2 (Punitive damages may be awarded "for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed.").

[93] *See Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (S.D. 1994).

department charged with overseeing all actions brought against the company.

Staff counsel keeps a file in this case, just as staff counsel keeps a file for every other case. Those files are tracked. Depositions of company personnel are not thrown away. When cases are closed, the files are archived. If staff counsel doesn't have copies of the testimony of company witnesses, outside counsel does, and they work for Defendant. The transcripts are in Defendant's possession, custody, or control. Refusing to produce them is simply abusive.

This District repeatedly compels discovery of deposition or trial testimony in insurance bad faith cases.[94] As Judge Viken observed, "'A trial is a public event. What transpires in the court room is public property.'"[95]

Judge Viken explained why defendants who withhold these transcripts act abusively:

> Defendant has the benefit of access to the transcripts of the depositions of its officers or other personnel who have testified in cases relating to claims of denial or discontinuation of benefits under long-term care insurance policies. The information would certainly be available to defendant to assist in preparing its witnesses and defense to this plaintiff's claims. The information is readily available to defendant and is very difficult, if not impossible, for plaintiff to obtain. The piecemeal process of obtaining this information by plaintiff would be extremely costly and contrary to the cause of providing a "just, speedy, and inexpensive determination of every action...."[96]

Plaintiff requests an order compelling the identification of relevant prior bad faith suits and any transcripts related to either those prior suits or to any party involved in this case.

## IV.    Defendant Should Identify Relevant Employees and Produce their Personnel Files

Plaintiff requested the personnel files for Defendant's employees who worked on Plaintiff's claim, including their supervisors all the way to the head of the claims department.

---

[94] *See, e.g.*, *Lyon*, 2011 WL 124629 at *11-13 (D.S.D. 2011); *McElgunn v. CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 84) (D.S.D. 2007); *Beyer v. Medico Ins. Group*, 266 F.R.D. at 338 (D.S.D. 2009).
[95] *Lyon*, 2011 WL 124629 at *11-13 (D.S.D. 2011).
[96] *Id*. (quoting Fed.R.Civ.P. 1.).

Defendant responded with more boilerplate objections and assertions of privilege.  To date, Defendant has only agreed to produce two employees' personnel files, but only *after* the Court conducts an in camera review of those files.

> **Request for Production 7:**  Copies of all personnel files of Defendant's employees who handled, reviewed, supervised, and/or audited the Plaintiff's claim, including persons in the chain of command above these individuals up to the head of the claims department.  In order to protect the privacy of the affected employees, Plaintiff agrees that none of these documents shall be used for any purpose outside this lawsuit or disseminated in any way or made available to the public without redacting the names and other identifying information pertaining to the employees.

This Court, along with the other Judges in this District, repeatedly orders production of personnel files over insurer objections in bad faith cases.[97]  As Judge Viken observed from a defense expert in *Torres*, "[i]f you give somebody a number, an objective they have to reach, and you tie it to their career, they are going to reach that number or they are going to manipulate that number so that it comes out the way they want it.  And believe me it's been done.  I have seen it done."[98]  In fact, as this District's Courts have observed, corporate incentives for bad-faith behavior are often found in its employee's personnel files.[99]

Defendant stated it is only willing to produce two personnel files:  Roberta Sniffen and Sherri Wade.  Defendant, however, refuses to turn over any personnel files until the Court *first* conducts an in camera review.  Even so, Ms. Wade reports to Ms. Sniffen who, in turn reports to Kristine Shares (the branch manager) who then reports to Dave Conner (the head of the claims

---

[97] *See Kirschenman v. Auto-Owners*, 280 F.R.D at 483 (D.S.D. 2012); *Lyon v. Bankers Life and Cas. Co.*, 2011 WL 124629 at *8 (D.S.D.); *Swigart v. Progressive Classic Ins. Co.*, 2005 WL 138754 (D.S.D.); *Torres v. Beverly Enterprises, Inc., et. al.*, Civ. 01-5056 (Docket 43) (D.S.D. 2002).

[98] *Lyon v. Bankers Life and Cas. Co.*, 2011 WL 124629 at *8 (D.S.D.)

[99] *See Kirschenman v. Auto-Owners*, 280 F.R.D at 483 (D.S.D. 2012); *Lyon v. Bankers Life and Cas. Co.*, 2011 WL 124629 at *8 (D.S.D.); *Swigart v. Progressive Classic Ins. Co.*, 2005 WL 138754 (D.S.D.); *Torres v. Beverly Enterprises, Inc., et. al.*, Civ. 01-5056 (Docket 43) (D.S.D. 2002).

department.   Defendant is unwilling to turn over Ms. Shares or Mr. Conner's personnel files.

These upper level personnel files, however, often contain important information not found in the files of lower-level claims handlers and their supervisors.  For example, only the upper level supervisors are privy to management strategies and plans.  They implement the policies and strategies to contain costs, limit claims payments, and establish claims handling rules.  These upper level claims managers are the ones whose incentives reflect what the *institutional* behavior of an insurance company is.  While an individual claims examiner whose deviation from decided claims handling procedures might not rise to the level of institutional bad faith, if that employee is acting based on directives and policies implemented by upper level managers who are compensated based on how those *global* procedures affect the bottom line, that is another matter entirely.

That is why in insurance bad faith cases, these multiple levels of personnel files are important.  These files show the narrow scope of the claims examiners' actions in the larger context of what the overall corporate strategy is.   That demonstrates both malice and reprehensibility.

This Court's own experience shows how important these upper level management personnel files can be.  In *Torres v. Travelers Insurance Company*, the defendant, Travelers, denied the existence of a particular incentive bonus plan.[100]  The claims examiners' personnel files didn't reveal any of these incentive plans.  The upper level managers' files, however, revealed a letter congratulating one of these managers on his performance bonus.  This admission led to additional discovery uncovering a system of bonuses tied directly to reducing claim payments.  As this Court noted, "The claims incentive bonus program rewarded certain

---

[100] *Torres v. Travelers Ins. Co.*, Civ. No. 01-5056, Doc. 327, pp.29-31 (D.S.D., W.Div. Sept. 30, 2004),

employees who met targets or predetermined goals for claim payments, which were set by Travelers' senior management and board of directors…. The first objective listed in the plan is reducing previous year's claims payouts."[101] The Court also observed how these upper level manager's decisions trickled down to their claims examiners.[102]

The Court discussed the issue further:

Although TIC [Travelers Insurance Company] contends its incentive programs were to reward better handling of claims, including earlier medical intervention and earlier return to work, defendants' credibility was extremely compromised during trial. First, during discovery, defendants denied the existence of any documents outlining the incentive plan. Following a court order to compel production of said documents, defendants produced two incentive plans. Second, defendants' response to request for production of documents also denied the existence of documents justifying Florek's incentive award. At trial, Armentano admitted such information is available through the Human Relations Department and is readily accessible. Third, Armentano testified that reference to targets and predetermined goals for claim payments in the plan documents was "a very imprecise use of language." He stated, however, that the incentive programs "impact the behavior of people in the management and processing and payment of claims." Fourth, Armentano testified that the incentive plans were not distributed to employees, but rather were merely internal HR documents used by HR employees. Armentano then admitted that HR distributes summary plans that contain three to five pages of key points to managers. But defendants failed to provide copies of these summary plans to Torres, despite being responsive to Torres' discovery requests, and failed to introduce such plans as evidence at trial. As a result, the court gave the jury an adverse inference instruction.[103]

Here, there are only levels of management above Ms. Wade, the lowest-level claims manager in the case. Their personnel files would not be burdensome to obtain or produce. There is already a protective order in effect for this case. The files could easily contain relevant information. They should be produced.

## V.  Defendant Should Produce a Complete Copy of its General Claims Manual, Any Quality Assurance Manuals, its Best Practices, and its Audit Procedures

---

[101]  *Id*. at p. 29.
[102]  *Id*. at pp. 29-30.
[103]  *Id*. at pp. 30-31.

21

**Request for Production 3:**   All documents referencing or related to Defendant's Best Practices with regards to automobile claims from January 1, 2002 to present.

**Request for Production 17:** Any and all documents, including video presentations, PowerPoint™ Presentations, manuals, computer presentations, bulletins, guidelines, or anything else used to train or assist Defendant's automobile claims personnel in processing claims. This request is limited to documents created from January 1, 2007 to the present.  It includes but is not limited to information available online.

Courts in this District recognize that discovery of claims manuals are discoverable and highly relevant to bad-faith cases.[104]   These kinds of documents "potentially lead to the discovery of admissible evidence … as to whether [an insurer] properly handled or evaluated" a claim.[105]

Defendant has produced hundreds of pages of documents related to its claims manuals. Defendant states that the only documentation of its best practices are its claims manuals.  As a preliminary matter, Defendant's allegation that it has no best practices list is curious.  Most insurers have a best practices list independent from its claims manuals.  Defendant's counsel has not disclosed the source for Defendant's claim regarding its lack of a best practices list. Similarly, Defendant has not described the amount of effort Defendant expended to try and identify such a document.  With regards to other manuals, it appears that Defendant has fully produced a copy of the branch claims manual, but there are other manuals that are incomplete or missing.

For example, Defendant produced Chapter 4, "Employment Policies" and Chapter 11,

---

[104] *See, e.g.,  Hurley v. State Farm Auto. Ins. Co.*, 2012 WL 1600796 at *5 (D.S.D.); *Swigart v. Progressive Classic Insurance Company; McElgunn v. CUNA Mut. Ins. Society.*, Civ. 01-5061 (Doc. 462) (Joint Trial List) (D.S.D., W.Div., 2009); *McElgunn*, 2008 WL 2717872 at *5 (D.S.D.); *Torres v. Beverly Enterprises, Inc.*, Civ. 01-5056 (Doc. 43) (D.S.D. 2002); *Brown Bear*, 266 F.R.D. at 329.
[105]  *Lillibridge*, 2013 U.S. Dist. LEXIS 63398 at *30.

"You at United Fire Group" from some sort of manual.[106]  Hundreds of pages earlier, Defendant

included a page from Chapter 7 of this same manual.[107]  Then, just under a thousand pages later,

Defendant included some more pages from what appears to be Chapter 13 from the same

manual.[108]  The remaining chapters, however, are missing.

There also appears to be another "CLAIM MANUAL" located on a "D:/" drive

somewhere at United Fire.[109]  Looking to pages within this manual, this "D:/" drive appears to

contain multiple sections of a claims manual.[110]  Plaintiff has no idea whether this other claims

manual is complete or who uses it.  Defendant should identify the document, its custodians, and

who uses it.

Similarly, Defendant failed to include any training documents or other training materials

it uses to educate its employees.  Meanwhile, Defendant advertises to prospective employees its

emphasis on education, as evidenced by its own website.[111]  In fact, United Fire promises its

future employees that "Continuing education is important at United Fire. We provide employees

with the opportunity to earn insurance industry and professional designations through a variety

of nationally recognized institutions, including the Insurance Institute of America, Life Office

Management   Association   and   American   Institute   for   Chartered   Property   Casualty

Underwriters."[112]  Defendant never identified these educational programs to Plaintiff.  Plaintiff

---

[106]  *See* Affidavit of Counsel, Exhibit HH at UF000838-40 (Unidentified United Fire Manual).
[107]  *See* Affidavit of Counsel, Exhibit II at UF000756 (Page from Chapter 7 of Unidentified United Fire Manual).
[108]  *See* Affidavit of Counsel, Exhibit JJ at UF001559-79 (Excerpts from Chapter 13 of Unidentified United Fire Manual).
[109]  *See* Affidavit of Counsel, Exhibit KK at UF000841 (Hard Drive Claim Manual).
[110]  *See*, *eg*. *id*. at UF000848 ("file:///D:/DeptPolicy/agtcomm.htm"); UF000879 ("file:///D:/Evaluation/partiesFactors.htm"); UF000892 (file:///D:/genproc/reportObj.htm).
[111]  *See* http://www.unitedfiregroup.com/careers/benefits.aspx, Career Development Tab.  Last accessed October 17, 2013.
[112]  *Id*.

discovered them through a simple view of Defendant's website.  At a minimum, Defendant should identify the curricula for these programs so Plaintiff can gauge which materials would be relevant.

Additionally, Defendant has not produced any documents referring to its internal best practices or to any audit procedures.  These kinds of documents are frequently important to show a defendant's knowledge of what practices should be and whether it intentionally violates those best practices for profit.  Defendant should produce these documents also.

## VI.     Defendant Should Fully Disclose its Bonus, Compensation, and Incentive Program Documentation

Plaintiff issued several requests related to bonuses, compensation, and incentives. Defendant produced some documents related to these materials, but it is difficult to believe that a large insurance company like Defendant would only have 18 pages to document what programs are available, who is eligible for the programs, and what factors go into these programs.

> **Request for Production 13:** All documents referencing or related to bonus or award programs for Defendant's employees who handled, reviewed, supervised, and/or audited Plaintiff's claim, including persons in the chain of command above these individuals up to the head of the claims department from January 1, 2007 to present.

> **Request for Production 15:** All documents referencing or related to increases in salary, bonuses, commissions or awards for personnel handling automobile claims, including supervisory personnel up to the head of the claims department from January 1, 2007 to present.

> **Request for Production 16:** All documents referencing or related to performance-based incentive plans used by or communicated to personnel handling automobile claims, including supervisory personnel up to the head of the claims department from January 1, 2007 to present.

This Court has considered insurer objections to producing bonus, compensation, and incentive programs in a number of bad faith cases and consistently indicated that these

24

documents are within the scope of proper discovery.[113]   As the Court recently stated, "this information is relevant because monetary incentives could establish company and employee motives for how [an insurer] investigates or handles claims with its policyholders and could lead to other facts that could bear upon a punitive damages or bad faith determination."[114]

Defendant responded to these requests by providing 18 pages detailing some bonus and incentive programs.  None of the documents, however, discuss how management calculates bonuses, raises, or any other compensation mechanisms.

As Jack Welch, former CEO of General Electric said, "Show me a company's various compensation plans, and I'll show you how its people behave."[115]   In the post-trial order in *Torres*, this court addressed the relevance of employee bonus plans in supporting an insurance bad-faith case:

> The claims incentive bonus program rewarded certain employees who met targets or predetermined goals for claim payments….   The first objective listed in the plan is reducing the previous year's claims payouts….   [T]here is sufficient evidence from which the jury could conclude that defendants' incentive plans improperly motivated claims handlers and created an improper corporate culture that required an award of punitive damages….[116]

The *Torres* case resulted in an article in *Claims Magazine*, a national insurance publication, entitled "*Slouching to Gomorrah:  Adjuster Pay Plans and Bad Faith.*"[117]   In discussing *Torres*, the article observed:

---

[113] *Lillibridge*, 2013 U.S. Dist. LEXIS 63398 at *31-32;  *Kirschenman*, 280 F.R.D at 485-86; *Lyon*, 2011 WL 124629 at *10; *Swigart*, 2005 2L 1378754 at *1; *McElgunn v. CUNA Mutual Group, et. al.*, Civ. 06-5061 (Docket 84); *Beyer v. Medico Ins. Group*, 2009 WL 736759 at *3 (D.S.D. 2009); *Pochat v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 5192427 at *5 (D.S.D. 2008).

[114]  *Lillibridge*, 2013 U.S. Dist 63398 at *31-32.

[115] *See* Affidavit of Counsel, Exhibit LL, Welch, "How to be a Good Leader," Newsweek, April 4, 2005.

[116] *Lyon*, 2011 WL 124629 at *10 (quoting *Torres*, Civ. 01-5056 (Doc. 327, pp. 29-31, 43)).

[117] *See* Affidavit of Counsel, Exhibit MM, Quinley, Kevin, "*Slouching to Gomorrah:  Adjuster Pay Plans and Bad Faith.*" Claims Magazine, October, 2004.

The adjuster's job is not to turn a profit for the company, to advance a company's AM Best rating, or to max out on the incentive compensation plan.  Once these factors creep into the adjuster's consciousness at the file handling level, mischief creeps in.  Dysfunctional incentives drive suspect claim practices….

Doubtlessly, when they launch such plans, insurers top financial management teams applaud themselves for their result oriented thinking in linking adjuster pay to the corporation's financial goals.

Right on.  About time we held those claims people accountable for financial results.  Right on indeed.  Right on... into the bad faith cesspool.[118]

Defendant's internal "Goals & Objectives" demonstrate just why such discovery is important.  Defendant lists its first goal as "[t]o be among the most consistently profitable insurance companies."[119]

Additionally, according to a manual available to Defendant's employees, an employees bonus is calculated based off of a plan document.[120]  It is unclear whether the "Annual Incentive Plan" documents produced by Defendant refer to this bonus plan or to some other incentive plan related to salary increases.[121]  Plaintiff believes these documents are the bonus plan document. The next pages, however, are spreadsheets detailing the bonus plan for the years 2003 through 2009.[122]  Defendant, however, failed to produce these same spreadsheets for 2010, 2011, and 2012.  Given that Ms. Plucker's accident occurred in 2011, Defendant should produce for those other years also.

Furthermore, these bonus spreadsheets reference "threshold," "target" and "UFG Gold

---

[118] *Id.*
[119] *See* Affidavit of Counsel, Exhibit NN  at UF000777 (Corporate Goal Documentation).
[120] *See* Affidavit of Counsel, Exhibit II at UF000756 (Page from Chapter 7 of Unidentified United Fire Manual).
[121] *See* Affidavit of Counsel, Exhibit OO at UF000757-67 (Annual Incentive Plan (AIP) Plan Document).
[122] *See* Affidavit of Counsel, Exhibit PP at UF000768-74 (Bonus Plan Spreadsheet).

26

Club" measures.[123]   The plan document indicates that these "targets and weightings may be changed annually based on [Defendant's] shift in focus."[124]   Defendant, however, didn't provide any documents describing what these weightings are or what factors go into its annual decision to shift focus.   Since the plan document indicates that it makes these evaluations on a yearly basis, Defendant should disclose the documents related to how it decides what weights to give and targets to pursue.

Aside from these other details, Defendant hasn't produced any documents related to this "UFG Gold Club."   From the plan document and the bonus plan spreadsheets, it appears that the Gold Club is important to Defendant.   Defendant should produce all documents related to this Gold Club.

Defendant failed to disclose any documents relating to how salary increases are calculated.   Those salary increases can be just as important to an employee as their annual bonus. Defendant should produce documents related to these salary increases also.

## VII.    Defendant Should Produce All Documents Related to Cost Containment

Plaintiff requested documents that both identify Defendant's cost containment programs and describe those same programs.   Defendant claims that this information exists solely within the claims and branch manuals.   Defendant's production, however, indicates otherwise.

**Request for Production 10:**  All documents related to cost containment programs or efforts to lower costs with respect to handling of automobile claims from January 1, 2007 to present.

**Request for Production 11:** All documents related to efforts to increase profitability with respect to handling of automobile claims from January 1, 2007 to present.

---

[123]   *See*, *eg.*, *id.* at UF000768.
[124]   *See* Affidavit of Counsel, Exhibit OO at UF000761 (Annual Incentive Plan (AIP) Plan Document).

**Request for Production 12:** All documents related to efforts to reduce loss ratios or claim severity costs since January 1, 2007 to present.

"A claims adjuster's job is not to turn a profit for an insurance company."[125]   An insurance company that does so often uses bad faith tactics to make those profits.  An insurer's cost containment programs are viewed in much the same light as its bonus programs for discovery.[126]

Defendant set as a goal "Loss Adjustment Expense Control."[127]   According to this goal sheet, "Doug Walters" was assigned the task to "[d]efine, refine, and implement strategies that will assist United Fire Group in controlling loss adjustment expense."[128]   At a minimum, Defendant should produce the personnel file for Mr. Walters.  Like the upper level manager in *Torres*, Mr. Walters is setting goals that cause adjusters to put Defendant's interests ahead of its policyholders, like Ms. Plucker.  Plaintiff should be permitted to discover whether there is a nexus between claims minimization and/or deterrent strategies and compensation and/or evaluations.  This document also indicates that Defendant has a defined strategy at controlling loss adjustment expense.  Defendant, however, has not produced any documents that discuss what that strategy is or how it is implemented.  It should do so.

Additionally, United Fire set "Medical Cost Containment" as another goal.[129]   Further refinement and implementation of this goal was – again – assigned to Mr. Walters.  As was the case with its loss adjustment expense control goal, Defendant failed to produce any documents related to its medical cost containment program.  It merely identified the goal without

---

[125] *See* Affidavit of Counsel, Exhibit LL, Quinley, Kevin, "*Slouching to Gomorrah:  Adjuster Pay Plans and Bad Faith.*" Claims Magazine, October, 2004.
[126] *Lillibridge*, 2013 U.S. Dist. LEXIS 63398 at *36-37.
[127] *See* Affidavit of Counsel, Exhibit NN at UF000780 (Corporate Goal Documentation).
[128] *Id.*
[129] *Id.* at UF000781.

documenting what procedures it relies on to implement the goal.  Those documents should be produced also.

Ultimately, even though Defendant claims that it was unable to find any cost containment documents, the documents it already turned over indicates otherwise.  Defendant set specific goals and targets for cost containment for both claims practices and medical expenses.  Given that Plaintiff's case centers around Defendant's claims practices and efforts to contain medical expenses, Defendant should, at the least, turn over documents related to these cost containment measures.

## VIII.   Defendant Should Produce Documents Related to its Regulatory Activities

Plaintiff requested documents related to regulatory complaints against Defendant and other documents Defendant filed with various state regulatory agencies.  Defendant failed to turn any of these documents over.  Defendant says that no responsive documents exist related to med pay and med auth. claims.  Defendant, however, only discussed complaint files.  Meanwhile, Plaintiff's request was more expansive than that.

> **Request for Production 23:** All documents referencing or related to any document or complaint filed with or received from any State Department of Insurance involving Defendant's handling of first-party automobile claims from January 1, 2007 to present.  This includes, but is not limited to, complaints, complaint registers or logs, complaint files, correspondence to and from any state regulator, any documents showing disposition of complaints, regulatory actions, market conduct examinations, cease and desist orders, consent orders, reports of examinations, corrective orders, corrective action plans, annual or periodic reports, or regulatory bulletins.

Discovery of regulatory complaints against insurance companies "have previously allowed by the district court."[130]  As pointed out by this Court in *McElgunn*, "regulatory actions have a nexus to the harm suffered by plaintiff…" and "may be relevant to illustrate defendant's

---

[130] *Lyon*, 2011 WL 124629 at *15 (citing *McElgunn*, Civ. 06-50612 (Doc. 206)); *Kirschenman*, 280 F.R.D at 491; *Beyer*, 266 F.R.D. at 339.

knowledge that there was no reasonable basis to deny [plaintiff's] claim."[131]  In *Beyer*, Judge Duffy pointed out that "documents in [defendant's] possession relating to complaints made to state insurance regulators undoubtedly 'bear on' litigation over a claim of bad faith."[132]

In a more recent decision, Judge Duffy observed that "whether the insurance company repeated its misdeeds over and over, or whether its conduct in the plaintiffs' case was a mere mistake" is a punitive damages consideration in bad faith litigation.[133]  "Thus, the fact that there may have been other, similar complaints" to state regulators against a particular defendant "is relevant."[134]

Regulatory complaints or filings could demonstrate that Defendant engages in claims handling practices designed to discourage or minimize its claims exposure.  It could also demonstrate that the conduct Defendant engaged in here has occurred numerous times.  It is highly irregular that an insurance company Defendant's size would not have had any regulatory filings related to its med pay or med auth provisions.  Plaintiff should be allowed to dig further into this information.

---

[131] *McElgunn*, Civ. 06-50612 (Doc. 206).
[132] *Beyer*, 266 F.R.D. at 339.
[133] *Kirschenman*, 280 F.R.D. at 491.
[134] *Id.*

**REQUESTED RELIEF**

Plaintiff requests the following relief:

1.    An order compelling full and complete response to Plaintiff's Interrogatories, No. 5 and Requests for Production of Documents Nos. 7, 10, 11, 12, 13, 15, 16, 17, and 22.

2.    An order for payment of attorney fees and expenses related to Plaintiff's efforts to enforce compliance.

Dated this 21st day of October, 2013.

         _/s/Robert D. Trzynka_____
         Michael D. Bornitz
         Robert D. Trzynka
         Cutler & Donahoe, LLP
         100 N. Phillips Ave., 9th Floor
         PO Box 1400
         Sioux Falls, SD  57101-1400
         (605) 335-4950
         *Attorneys for Plaintiff*

31

**CERTIFICATE OF COMPLIANCE**

In accordance with LR 7.1(b)(1), I certify that this brief complies with the word limits described therein.  This brief was prepared using MS Word, Times New Roman, 12 font, and contains 11,943 words.  I relied on the word count provided by the word-processing software to prepare this certificate

Dated at Sioux Falls, South Dakota, this 21st day of October, 2013.

  _/s/Robert D. Trzynka_____
  *One of the Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on the 21st day of October, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the appropriate parties:

- **Lon Kouri**
  LKouri@mayjohnson.com

- **Eric DeNure**
  edenure@mayjohnson.com

/s/Robert D. Trzynka
Michael D. Bornitz
Robert D. Trzynka
Cutler & Donahoe, LLP
100 N. Phillips Avenue, 9th Floor
PO Box 1400
Sioux Falls, SD  57101-1400
Telephone:  (605) 335-4950
Facsimile:  (605) 335-4966
*Attorneys for Plaintiff*