# EXHIBIT B

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

1   A.   I guess if they wonder, they should have
2   asked.
3   Q.   So it's the policyholder's responsibility?
4   A.   No.
5        MR. DeNURE:  Objection, foundation.
6   A.   No.
7   Q.   Okay.  Whose responsibility is it?
8   A.   We would gladly pay for those records.
9   Q.   Okay.  Is it United Fire's -- Should
10  United Fire inform its policyholder that it will pay
11  the costs of obtaining medical records if the
12  policyholder gets them his or herself?
13  A.   I have trouble with your question, because
14  if we were asked, we would have advised that.
15  Generally -- Generally we don't have any problems.
16  99.9 percent of the time there are no issues with a
17  medical authorization being signed or medical records
18  being received, and we pay for those records each
19  and every time.  So this isn't a normal situation.
20  Q.   Is that a yes or a no?
21  A.   No.
22  Q.   Fair enough.  And just so that I know I'm
23  clear, you would accept a -- would you accept a
24  medical authorization prepared by a policyholder?
25  A.   If through that authorization we achieved

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1        Q.    What kind of form is that?
 2        A.    Hospital billing, a health insurance claim
 3   form.
 4        Q.    Did United Fire receive those frequently?
 5        A.    Yes.
 6        Q.    From multiple providers?
 7        A.    (Witness nods head.)  Multiple vendors,
 8   yes.
 9        Q.    Okay.  Sorry.  Multiple vendors.  So
10   multiple vendors use this form?
11        A.    Yes.
12        Q.    Okay.  And you see there in the bottom
13   right-hand corner where it has OMB, and there's an
14   OMB number there, isn't there?
15        A.    Yes, there is.
16        Q.    Okay.  And do you see in the bottom
17   left-hand corner where it says, NUCC instruction
18   manual available at nucc.org?
19        A.    Uh-huh.
20        Q.    Okay.  Do you train your direct reports
21   and their direct reports on how this form is supposed
22   to be interpreted?
23        A.    We may review it together, but --
24        Q.    Do you have the instruction manual for this
25   form?
```

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1       A.   No.
 2       Q.   Have you ever read the instruction manual
 3  for this form?
 4       A.   No.
 5       Q.   I'm going to have you take a look at
 6  option 12.  Do you see option 12 there on the left
 7  side?  Where it has, signature on file.
 8       A.   Uh-huh.
 9            MR. DeNURE:  Box 12?
10            MR. TRZYNKA:  Box 12.
11       Q.   Would you read that section.
12       A.   Read back of form before completing and
13  signing this form.  Patient's or authorized person's
14  signature.  I authorize the release of any medical
15  records or other information necessary to process
16  this claim.  I also request payment of government
17  benefits either by (sic) myself or to the party who
18  accepts assignment below.
19       Q.   Okay.  Is that a medical authorization?
20       A.   It --
21            MR. DeNURE:  Objection, calls for a legal
22  conclusion.
23            Answer if you know, Kristine.
24       A.   I highly doubt this (indicating) would
25  suffice.  I don't know.  I don't know.  It reads as
```

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1  such, but --
 2      Q.  Why don't you know?
 3      A.  Because we've never sent a bill to a
 4  provider and said, hey, this is signed, so provide
 5  us the records.
 6      Q.  Why haven't you?
 7      A.  Because it's our procedure to obtain a
 8  medical authorization from the injured individual --
 9      Q.  Is it your --
10      A.  -- to obtain records.
11      Q.  And is that because it's your procedure to
12  rely exclusively on the forms that you prepare?
13      A.  It's how we've learned to process their
14  medical claim.
15      Q.  And how did you learn to process their
16  medical claim in that specific way?
17      A.  It's just the guidelines.  If you have a
18  med pay claim, you send out a med auth, and then when
19  you get the auth back, you send a request for medical
20  records.
21      Q.  And who devised -- Who developed that
22  guideline?
23      A.  It's been the procedure since I've worked
24  in claims, which has been since '97.
25      Q.  So it's been the procedure of United Fire
```

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1  that is -- the adjuster would handle.  There would be
 2  no expense.
 3       Q.   No expenses with subrogation, is that your
 4  claim?
 5            MR. DeNURE:  Well --
 6       A.   For that process, yes.
 7       Q.   On a first-party, although there is no
 8  subrogation expenses.
 9       A.   If we handle it internally by our adjuster,
10  that is correct.
11       Q.   Are there subrogation expenses if there's
12  an attorney involved?
13       A.   Yes.
14       Q.   Does United Fire make any efforts to reduce
15  subrogation expenses?
16       A.   We are cognizant of what they are, and we
17  attempt to ensure that our expenses are appropriate.
18       Q.   Is that a yes or a no?
19       A.   Yes.
20       Q.   Does United Fire do anything to try and
21  reduce medical records expenses?
22       A.   No.
23       Q.   It's not one of the loss adjustment
24  expenses that United Fire tries to control?
25       A.   We attempt -- no, but I want to clarify,
```

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1  because we are cognizant of what we spend, but I have
 2  never told someone not to request records because
 3  there's an expense incurred, so --
 4       Q.   Are you aware that medical records expense
 5  is one of the loss adjustment expenses that was a
 6  goal for reduction in 2010?
 7       A.   Yes, I am.
 8       Q.   Are you aware that that was one of the
 9  loss adjustment expenses that was a goal to reduce
10  in 2011?
11       A.   It is a loss adjustment expense, yes.
12       Q.   Were you aware that that was one of the
13  goals in 2011?
14       A.   Specific to medical?
15       Q.   Specific to -- That it was one of the
16  loss adjustment expenses included in the goals for
17  reduction of loss adjustment expenses in 2011.
18       A.   Yes.
19       Q.   How do you know that?
20       A.   I believe the goal is to reduce expenses,
21  to pay what's appropriate.  We've never talked
22  specifically about the medical expense, my boss and
23  I, so --
24       Q.   Sure.
25            MR. TRZYNKA:  Eric, if you don't mind,
```

```
 1         A.    (Witness complies.)
 2         Q.    This says, this con -- Okay.  Sorry.
 3   After the patient's name, address, date of birth,
 4   et cetera, in all caps it says, this consent to
 5   release information is limited to the following, and
 6   box 1 is checked, and what are the dates on that?
 7         A.    5-24-11 to present, so the date of the loss
 8   to the present date.
 9         Q.    Is United -- Is Sherri concerned about
10   preexisting records?
11         A.    No.
12         Q.    Is Sherri concerned about -- After your
13   review of 108, 110 and 113, is Sherri, Roberta or
14   anyone on this claim concerned about any records
15   other than the chiropractic records from Dr. Lanpher?
16         A.    No.
17         Q.    How do we know that?
18         A.    Because that's who we're submitting the
19   request to.  I mean -- And we've told her that in
20   this letter (indicating).
21         Q.    You advised her of it in the letter?
22   Sherri advised Debbie exactly the reason for the
23   medical authorization, is that accurate?
24         A.    Yes.
25         Q.    And as a claims branch manager, is that
```

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

1   A.   Three years.
2   Q.   You would pay any bills related to the
3 accident that was incurred within three years of this
4 accident, would you not?
5   A.   Which was related to the automobile
6 accident, yes.
7   Q.   And we know that it's only records related
8 to the automobile accident, because that's
9 specifically advised to Ms. Plucker in paragraph 3
10 of UF 108?
11   A.   Yes.
12       MR. DeNURE:   I don't have any further
13 questions.   Thank you.
14              REDIRECT EXAMINATION
15 BY MR. TRZYNKA:
16   Q.   Let's take a look at UF 108.
17   A.   (Witness complies.)
18   Q.   Does that letter tell Ms. Plucker that the
19 medical authorization only allows United Fire to
20 obtain records from -- related to the claim?
21   A.   I believe so, yes, because it's the only
22 treatment provider listed on the attachment, so yes.
23   Q.   Would the authorization itself allow
24 United Fire to obtain more than just the records
25 associated with the claim?

IRISH REPORTING, INC.
319-393-5050

74623885-bfa2-4933-b8c8-45c616da0201

DEPOSITION OF KRISTINE SCHARES, 10/28/2014

```
 1      A.    Without it being altered?
 2      Q.    On 110.  On 110.  Would that form
 3  (indicating) allow United Fire to obtain more than
 4  just the records associated with the claim?
 5            MR. DeNURE:  And I'll object to the form
 6  of the question in that it doesn't accurately reflect
 7  the date limitation on UF 110; the question doesn't.
 8      Q.    Okay.  With -- I'm not talking about dates.
 9  I'm talking about providers.
10      A.    This (indicating) would allow.
11      Q.    It would allow United Fire to obtain more
12  than just the medical records associated with the
13  claim?
14      A.    Yes.
15            MR. TRZYNKA:  I have no further questions.
16                    RECROSS EXAMINATION
17  BY MR. DeNURE:
18      Q.    Were you going to finish his question?
19      A.    We only request what's necessary.  I mean,
20  we -- how would we know where -- and why would we
21  care?  Our concern is that we get the records so we
22  can process her medical bills, sir.
23      Q.    Is that why you send out a treatment
24  provider list?
25      A.    Yes.
```