# EXHIBIT D

DEPOSITION OF SHERRI WHITE, 10/29/2014

```
 1        Q.    Okay.  How many of these have you seen in
 2   your insurance career?
 3        A.    Thousands.
 4        Q.    Pretty common use?
 5        A.    Yes.
 6        Q.    Have you ever received training on how
 7   this form is supposed to be interpreted?
 8        A.    Yes.
 9        Q.    Where did you receive that training?
10        A.    I recall State Farm for sure.
11        Q.    Okay.  Did you United Fire provide you
12   training on this form?
13        A.    Not that I can recall, but they may have.
14        Q.    Did you receive any training specifically
15   with regard to box 12, if you wouldn't mind just
16   reading through that quick?
17        A.    (Witness complies.)  No.
18        Q.    You did not receive training regarding
19   box 12?
20        A.    Not that I recall.
21        Q.    Okay.  Would you read what box 12 says.
22        A.    It says, patient's or authorized person's
23   signature.  I authorize the release of any medical or
24   other information necessary to process this claim.
25   I also request payment of government benefits either
```

DEPOSITION OF SHERRI WHITE, 10/29/2014

1  forms. One's a consent to release form that we take
2  off of their website. The other one, sometimes
3  they'll send out a letter, and they'll send it to us
4  saying, our beneficiary, your insured, needs to fill
5  this out, and I saw that when I reviewed the file
6  today.
7      Q.   Did Debbie eventually sign the consent to
8  release form?
9      A.   Not that I recall. She might have. I --
10 Do you want me to look back?
11     Q.   No, that's fine. We can talk about that
12 later.
13     A.   Okay.
14     Q.   I'm just going to verify a few other
15 things. If you'd take a look at UF 105.
16     A.   (Witness complies.)
17     Q.   That's a -- What's the date that you got
18 that?
19     A.   June 10th, 2011.
20     Q.   Okay. Who is that from?
21     A.   The same chiropractor, Lanpher Chiropractic
22 office.
23     Q.   Does box 12 have signature on file there?
24     A.   Yes.
25     Q.   And then if you'd look at the next -- the

DEPOSITION OF SHERRI WHITE, 10/29/2014

```
 1   one just before that on UF 104.
 2        A.   (Witness complies.)
 3        Q.   Okay.  What date is that?
 4        A.   June 17th, 2011.
 5        Q.   Okay.  And is that from Dr. Lanpher?
 6        A.   Yes.
 7        Q.   And does that have the 12 filled out with
 8   signature on file?
 9        A.   Yes.
10        Q.   And then on all of the ones from 103 up
11   to 92, would you verify that all of those are from
12   Dr. Lanpher's office for Debbie Plucker and that
13   those all have signature on file in box 12?
14        A.   (Witness complies.)  Yes.
15        Q.   And I'm going to have you do the same for
16   UF 90 through 80.
17        A.   (Witness complies.)  Yes.
18        Q.   So from my understanding, I believe
19   that's all the records that -- or all the bills that
20   Dr. Lanpher submitted to United Fire on Debbie
21   Plucker's behalf, is that correct?
22        A.   I don't know.
23        Q.   Okay.  Could you verify -- If there are
24   any other bills, would they show up in the claims
25   file?
```

DEPOSITION OF SHERRI WHITE, 10/29/2014

1    A.   Yes.
2    Q.   Could you check to see if there are any
3 others that are in there -- any other bills that are
4 in the claim file for Dr. Lanpher?
5    A.   What dates of service did we just go
6 through?
7    Q.   We went from --
8    A.   Do you want me to make a log?
9    Q.   No.  I'm just -- I don't see any other
10 bills, and so I just want to make sure that that's
11 all the bills that were submitted on Debbie Plucker's
12 behalf.
13    A.   If that's all that's in the claim file,
14 I would say yes.
15    Q.   I don't see any others, so --
16    A.   Okay.
17    Q.   And -- Okay.  Let's go on to -- Let's go
18 back to UF 13.
19    A.   (Witness complies.)
20    Q.   Well, let's just -- when did -- Did
21 Debbie Plucker respond with the med auth at some
22 point?
23    A.   Yes.
24    Q.   Okay.  What med auth -- what did she --
25 Did she make changes to the med auth?

1  them.  Hers would have also looked highly suspicious,
2  too.  If I was going to release someone's private
3  information, and I got a document blacked up and
4  written all over, I probably wouldn't release
5  anything.
6      Q.  Did you ever call Dr. Lanpher's office to
7  check to see whether they would accept it?
8      A.  I don't believe so.
9      Q.  Have you ever used -- Are you aware that
10 there are hospitals that have their own medical
11 releases?
12     A.  Yes.
13     Q.  Have you used medical releases aside from
14 the one prepared by United Fire?
15     A.  I don't recall.  If I would have, it would
16 have been in a case where a hospital said, here,
17 you have to use this form, and then I would have
18 requested that from the insured.
19     Q.  Okay.  And who told you that -- did anybody
20 tell you that you can't accept an altered -- an
21 altered medical release?
22     A.  I would assume someone explained that to
23 me long ago, but who it would have been, I don't
24 know.
25     Q.  Was that someone here at United Fire?

DEPOSITION OF SHERRI WHITE, 10/29/2014

1  blank, the "to" section, that -- did she ever suggest
2  that you could have filled in Dr. Lanpher's office
3  there?
4      A.   I don't recall.
5      Q.   Okay.
6      A.   I certainly could have if that would have
7  made -- if that would have made Debbie at peace.
8  When I filled this (indicating) out, I didn't fill
9  out the "to," because I didn't know if she was
10 strictly limited to chiropractor, which often people
11 say, I'm going to the chiropractor, but they've also
12 already been to the emergency room, or they're going
13 to go see their regular medical doctor.  I would have
14 happily filled that out if that would have made
15 Debbie feel more at peace about what we were going
16 to order.
17     Q.   Well, do you see at UF 113, did she
18 identify any providers other than Dr. Lanpher?
19     A.   (Witness complies.)  No, but at the time
20 this (indicating) was generated, I wouldn't have had
21 that (indicating).
22     Q.   Right.  But as of 7-22, you would have
23 known that the only doctor she was treating with was
24 Dr. Lanpher, right?
25     A.   I don't know.

DEPOSITION OF SHERRI WHITE, 10/29/2014

```
 1        Q.    Well, did she identify anybody else in
 2   that -- in UF 113?
 3        A.    She did not, and you may recall that I said
 4   she stopped communicating with me, so --
 5        Q.    Well, did -- In that entire time did you
 6   ever receive any bills from any provider other than
 7   Dr. Lanpher?
 8        A.    No.
 9        Q.    Do you think she was treating with anybody
10   else at the time?
11             MR. DeNURE:   Objection, calls for
12   speculation.
13             Go ahead and answer.
14        A.    I have no idea.
15        Q.    Do you have any basis to think that she was
16   treating for these injuries with somebody else?
17             MR. DeNURE:   Same objection.
18             Go ahead and answer.
19        A.    Yes and no, because she didn't specifically
20   say somebody else, but I recall that she was 90 --
21   like 90 miles roundtrip away from him, she had other
22   medical providers in her life and just based on past
23   experience, it wouldn't have been out of the norm for
24   her to say, you know, my regular doctor's right down
25   the street, I'm not getting any better, so I went to
```

DEPOSITION OF SHERRI WHITE, 10/29/2014

```
 1   him last Tuesday.
 2        Q.   And the reason why I'm -- The reason why
 3   I'm asking is because, you know, I talked with
 4   Kristine Schares yesterday, and, you know, she was
 5   just saying, all we needed was the Lanpher records.
 6   Did you think that you needed more than the Lanpher
 7   records in --
 8        A.   No.
 9        Q.   -- July of 2011?
10        A.   No, not to process the bills I had, no.
11   And, again, if she just wanted to write his name in
12   there or have him write his name in there, if that
13   would have made her feel comfortable with it, I would
14   have happily done that.  I would have done that from
15   the beginning had I known.
16        Q.   Did you ever tell her that she could have
17   done that?
18        A.   I didn't personally, because she quit
19   talking to me pretty -- as soon as there was an issue
20   with that medical -- as soon as -- To begin with it
21   was, I didn't get the medical authorization, then
22   I'm going to send it back, then there was a lot of
23   delay there, and then once I realized that there was
24   some kind of concern, in her mind, about it, I had
25   like one conversation with her, and I think then she
```